**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Karen PINJUV, Defendant–Appellant.**

**No. 99–10597.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 20, 2000.

Filed July 21, 2000.

ALARCÓN, Circuit Judge.

Karen Pinjuv appeals from the order of the district court revoking her supervised release and sentencing her to a term of imprisonment. The district court revoked Pinjuv's supervised release after Pinjuv admittedly failed to comply with a condition of supervision requiring her "to participate in and successfully complete a mental health treatment program." In this appeal, Pinjuv contends that the condition was void and unenforceable, due to a mental illness which allegedly made compliance impossible, and consequently that the revocation of her supervised release based upon the condition violated due process. We have jurisdiction pursuant to 18 U.S.C. § 3742(a). We hold that the challenged condition was valid and enforceable notwithstanding Pinjuv's assertion that she lacked the power of volition to comply with it. We affirm the revocation of her supervised release, because we conclude that the district court did not err in determining that the imposition of a prison sentence was the proper remedy for her violation.

I

On April 30, 1991, Pinjuv pleaded guilty to bank robbery in the District Court for the District of Nevada and was sentenced to a three-year term of imprisonment and a three-year term of supervised release. She served her prison sentence at the Federal Medical Center in Lexington, Kentucky, where she resided in both the mental health unit and the special housing unit. After her release from the Federal Medical Center on November 25, 1993, she was placed in two separate mental health facilities where she began to serve her term of supervised release. Her mental condition began to deteriorate soon thereafter.

On October 17, 1994, Pinjuv was arrested for throwing rocks through the window of a bank. She was charged with malicious destruction of property, a misdemeanor. She was ordered to pay $438 in restitution.

Paul G. Turner, Assistant Federal Public Defender, Jason F. Carr, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant–appellant.

J. Gregory Damm, Assistant United States Attorney, Blair Smith, Assistant United States Attorney, Las Vegas, Nevada, for the plaintiff–appellee.

Before: ALARCÓN, O'SCANNLAIN, and GOULD, Circuit Judges.

On January 17, 1995, Pinjuv entered a branch of the Bank of America and grabbed a bank teller by her wrist. She showed the teller a note which stated, "put all the money in a bag—do not try anything smart." The teller summoned the service manager to her station and informed him that Pinjuv wanted to rob the bank. Pinjuv told the service manager: "I want her money." The service manager instructed another teller to activate the silent alarm and motioned to the bank security guard to come to the teller station. Before the security guard arrived, Pinjuv walked toward the safety deposit area of the bank. There, the security guard stopped Pinjuv by placing his arm around her neck and pulling one of her arms behind her. She was detained until law enforcement officers took her into custody.

Pinjuv was indicted on January 25, 1995, by a federal grand jury for the crime of attempted bank robbery. She entered a guilty plea on May 31, 1995. On July 27, 1995, the district court sentenced Pinjuv to serve fifty months in prison and to serve a three-year term of supervised release. On March 2, 1999, Pinjuv was released from prison and began serving her term of supervised release. One of the conditions of her release was that she "participate in and successfully complete a mental health treatment program, which may include outpatient counseling or residential placement, as approved and directed by the probation officer."

Pinjuv's probation officer consulted Las Vegas Mental Health, a state agency that employs experts to make assessments and recommendations regarding mental health needs, for a recommendation regarding a suitable mental health program. Approximately three months after her release from prison, Pinjuv was placed in a group home where she caused disruptions almost immediately. While residing at the facility, Pinjuv repeatedly locked herself in the bathroom, refused to eat, called 911, and threatened to hurt herself. Her behavior led to her removal from that group home. The probation officer notified the district

court of these incidents and of the fact that her mental health treatment had ceased. He advised against taking any adverse action, however, to allow Pinjuv an opportunity to participate in a second mental health treatment program.

Pinjuv's probation officer again consulted with Las Vegas Mental Health regarding the placement of Pinjuv in another group home. Las Vegas Mental Health, however, encountered difficulty in finding a program suitable to Pinjuv's needs, due in large part to her history of disruptive behavior. Ultimately, Pinjuv's probation officer was successful in placing her in the Salvation Army Pathways Program.

The probation officer advised Pinjuv that he would file a petition to revoke her supervised release if she failed to comply with the rules of the Salvation Army Pathway's Program or if she declined to take her medication, to eat, or to maintain her health. Despite this warning, Pinjuv again exhibited disruptive behavior in her second placement. She also refused to take her medication, declined to eat, and failed to comply with program rules.

On September 17, 1999, Pinjuv's probation officer filed a petition requesting that the district court revoke her term of supervised release and impose a sentence of imprisonment based upon her behavior while a resident in the mental health treatment program. At the revocation proceedings, the Government presented evidence that Pinjuv had failed to comply with the conditions of her supervision, and that she presented a danger to herself, to the members of her family, and to others. The probation officer also advised the court that Pinjuv was not amenable to supervision and that she would receive better mental health treatment in a penal facility. Pinjuv neither offered any evidence to rebut the Government's proof nor presented any evidence that an alternative to imprisonment was available or would be an appropriate remedy. When asked by the court what he would recommend, Pinjuv's counsel replied: "[I]f probation feels she is

not amenable to supervision, I would ask that they discharge her from supervision and let her go on the street, basically. It's not appropriate to put someone in prison because they are mentally ill." In rejecting that recommendation, the district court stated "[w]hile I appreciate that her mental condition creates a problem, I don't have any difficulty finding that she has voluntarily created the difficulties she has."

The district court revoked Pinjuv's supervised release and issued an order remanding her to the custody of the Attorney General for a term of incarceration of one year and one day. Because the district court found that Pinjuv was not amenable to supervision, it did not impose an additional period of supervised release following the completion of her term of imprisonment. Pinjuv is currently in custody at FWC Carlswell in Fort Worth, Texas. She is scheduled to be released on August 4, 2000.

## II

Pinjuv contends that the condition of supervised release requiring her to "participate in and successfully complete a mental health program" was unreasonable and unenforceable because she lacks the power of volition to comply with such a requirement due to her mental condition. She argues that the revocation of her supervised release based upon her failure to comply with that condition violated due process. She requests that we declare the condition unenforceable, vacate the district court's revocation order, and order her immediate release from prison. To support this position, she relies on dicta in *Sweeney v. United States*, 353 F.2d 10 (7th Cir.1965), and *United States v. Miller*, 549 F.2d 105 (9th Cir.1976).

■■■ We review the conditions of supervised release imposed by a district court for an abuse of discretion. *See United States v. Bee*, 162 F.3d 1232, 1234 (9th Cir.1998). We are not bound by dicta in decisions from our court or any other circuit. *United States v. Tsinnijinnie*, 601

F.2d 1035, 1038 (9th Cir.1979) (holding that "[t]his panel is not bound by dicta from prior cases"). Before discussing the relevant authority that does control our disposition of this matter, we summarize the actual holdings in the *Sweeney* and *Miller* cases.

In *Sweeney*, the petitioner filed a *pro se* petition pursuant to 28 U.S.C. § 2255, collaterally attacking his conviction under the Dyer Act on the ground that he was not competent to enter a guilty plea. 353 F.2d at 11. He also argued that his probation had been unjustly revoked after he violated a condition of probation that required him to "refrain from the use of alcoholic beverages in any form." *Id.* The district court denied the petitioner's request for appointment of counsel to assist him in the § 2255 proceedings and rejected the Government's suggestion that counsel should be appointed. *See id.* On appeal, the Government conceded that the denial of counsel was erroneous. *See id.* The Seventh Circuit expressly limited its decision to the confession of error, and remanded the matter for further proceedings. *See id.* at 11. Nevertheless, it "discuss[ed] briefly [the] petitioner's argument" that his probation was wrongly revoked. *Id.* The court stated:

It appears from the record that when probation was granted, the district court knew [the] petitioner's history of chronic alcoholism, and had indications of its pathological nature. We think consequently the probation condition under the facts of this case, would be unreasonable as impossible if psychiatric or other expert testimony was to establish that [the] petitioner's alcoholism has destroyed his power of volition and prevented his compliance with the condition.

*Id.* (footnote omitted).

In *Miller*, the appellant challenged the revocation of his probation based upon his failure to comply with a condition of probation mandating that "he not consume any alcohol." 549 F.2d at 106. We rejected his arguments that the condition in ques-

tion was unreasonable. *See id.* at 107. We expressed our holding in *Miller* in the following words:

The probation condition now under consideration is in our opinion a permissible exercise of discretion and therefore reasonable. Inasmuch as Miller's previous history was indicative to the Trial Judge that alcohol was a substantial contributing factor to his legal transgressions the imposition of the condition is certainly protective of the public interest. Whether the condition is rehabilitative or not, as is the case with every other probation condition, is somewhat dependent upon the probationer's motivation and effort in complying with the condition. Abstinence from alcohol may be achievable in some cases only with professional help and guidance. If this be the case with respect to a specific individual the imposition of a condition requiring abstinence obviously requires that the probationer who accepts the condition undertake whatever remedial help is necessary in his individual circumstance to enable him to comply with the condition. *The Court does not abuse its discretion by failing to impose conditions requiring the probationer to do. that which he can and should do for himself in the interest of achieving abstinence.*

*Id.* (emphasis added). In dicta, we commented as follows:

Of course if the probationer's condition is so debilitated that his power of will and self-determination are wholly destroyed by his ingestion of alcohol, as was the case in *Sweeney v. United States,* 353 F.2d 10 (7th Cir.1965) the condition in issue might be inappropriately ordered. There is no showing in the instant case of such circumstances.

*Id.*

In *Sweeney,* the Seventh Circuit cited the Supreme Court's decision in *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), in support of its comments. 353 F.2d at 11 n. 2. We are persuaded that *Robinson* is inapplicable to revocation proceedings. In *Robinson,* the appellant challenged the constitutionality of a California statute that made the status of addiction to narcotics a crime. 370 U.S. at 660, 661–62, 82 S.Ct. 1417. When examined, the appellant did not appear to be under the influence of narcotics or suffering any symptoms of addiction withdrawal. *See id.* at 662, 82 S.Ct. 1417. He was nevertheless convicted based solely on his admission that he had occasionally used narcotics and on testimony that officers discovered needle marks on his arm. *See id.* The Supreme Court held that the California statute was unconstitutional, because it punished the *status* of narcotics addiction, rather than the purchase, sale, possession, or use of narcotics, or the antisocial or disorderly behavior that results from their administration. *See id.* at 666, 82 S.Ct. 1417. The Court reasoned as follows:

It is unlikely that any State at this moment in history would attempt to make it a *criminal offense* for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. *But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.*

*Id.* at 666, 82 S.Ct. 1417 (emphasis added).

▬ The holding in *Robinson* does not compel the conclusion that a condition of release is void whenever the defendant may lack the volition to comply with it. A revocation of supervised release for the failure to comply with a condition of release is not analogous to a criminal prosecution of a status offense. *See Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (stating that "revocation of parole is not part of a criminal prosecution" and that "the full panoply of

rights due a defendant in such a proceeding does not apply to parole revocations"). Revocation proceedings do not punish a defendant for a new offense. Instead, they trigger the execution of the conditions of the original sentence for the offense of which the defendant has already been convicted. *See United States v. Paskow,* 11 F.3d 873, 881 (9th Cir.1993) (holding that revocations of supervised release and revocations of parole are indistinguishable for most purposes). In *Standlee v. Rhay,* 557 F.2d 1303 (9th Cir.1977), in reviewing the validity of a parole revocation, we stated as follows:

> It is well established that parole revocation is not part of a criminal prosecution. Revocation of parole is remedial rather than punitive, since it seeks to protect the welfare of parolees and the safety of society. The termination of parole results in a deprivation of liberty and thus is a grievous loss to the parolee. But the harshness of parole revocation does not alter its remedial nature.

*Id.* at 1306 (citations omitted).

▬ Given the unique nature of supervised release, we have recognized the broad discretion that district courts enjoy in fashioning the obligations of a convicted person during a period of supervision. *See United States v. Bahe,* 201 F.3d 1124, 1127 (9th Cir.2000). "We have consistently held—both before and after the enactment of the Sentencing Reform Act of 1984—that the guiding principle for determining the validity of a condition of supervised release is whether the condition imposed can reasonably be said to contribute significantly both to the rehabilitation of the convicted person and to the protection of the public." *Id.* at 1127–28 (internal quotations and brackets omitted) (quoting *United States v. Consuelo–Gonzalez,* 521 F.2d 259, 264 (9th Cir.1975) (en banc)). That, however, is far from saying that a condition of supervised release must always be one with which the defendant has the volitional power to comply. No one would doubt, for instance, that a condition of release requiring a defendant to obey the law would be valid as applied against a pyromaniac, who cannot resist the temptation to commit arson, or a kleptomaniac, who cannot control the urge to steal. For, as these examples point out, even conditions of release which are beyond a convicted person's control may be necessary to facilitate the rehabilitation process or to ensure the safety of society. *Cf. United States v. Brown,* 899 F.2d 189, 194 (2d Cir.1990) (holding that probation may be revoked even when a violation is involuntary). The question that we must ask in this case, then, is not whether the condition is void because compliance is beyond Pinjuv's control, but whether the condition is void because it does not contribute significantly to her rehabilitation or to the safety of society.

The Supreme Court's decision in *Bearden v. Georgia,* 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983), is illustrative of this principle. In *Bearden,* the defendant pleaded guilty to charges of burglary and theft and was sentenced to a period of probation. 461 U.S. at 662, 103 S.Ct. 2064. The probation was conditioned upon the defendant's satisfaction of a court order requiring him to pay a fine of $500 and restitution of $250 pursuant to a payment schedule. *See id.* Shortly before the balance of the fine and the restitution became due, the defendant notified the probation office that he was indigent, and that he could not afford to make the required payments. *See id.* at 663. When the defendant failed to make the required payments, the state filed a petition in the trial court seeking to revoke the defendant's probation. *See id.* The trial court granted the petition and sentenced the defendant to serve the remainder of his probationary period in prison. *See id.* The Supreme Court held that "it is fundamentally unfair to revoke probation automatically" without considering alternative remedies whenever a "probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own." *Id.* at 668–69, 103 S.Ct. 2064. The Court explained the reasoning, and the limitations of its decision, as follows:

*We do not suggest that, in other contexts, the probationer's lack of fault in violating a term of probation would necessarily prevent a court from revoking probation.* For instance, it may indeed be reckless for a court to permit a person convicted of driving while intoxicated to remain on probation once it becomes evident that efforts at controlling his chronic drunken driving have failed. Ultimately, it must be remembered that the sentence was not imposed for a circumstance beyond the probationer's control "but because he had committed a crime." *In contrast to a condition like chronic drunken driving, however, the condition at issue here—indigency—is itself no threat to the safety or welfare of society.*

*Id.* at 668 n. 9, 103 S.Ct. 2064 (citations omitted) (emphasis added).

■ The condition at issue in this matter, unlike the one considered in *Bearden,* is sufficiently related to the remedial goals of supervised release to be valid and enforceable. Here, the record shows that Pinjuv's mental illness was largely responsible for her criminal actions, and that without adequate treatment, she presented a potential risk to the safety of herself, her family, and others. The presentence investigation report states that Pinjuv functions better in a structured environment where her medication is monitored. From these facts, we conclude that the requirement that Pinjuv successfully participate in a mental health treatment program is sufficiently related to her rehabilitation and to the protection of society to satisfy the requirements of due process.

■ Our conclusion that the challenged condition of release is valid and enforceable, however, does not end our analysis regarding whether the revocation of Pinjuv's supervised release satisfied the requirements of due process. We have instructed that district courts must under-

take a two-step inquiry in determining whether to revoke a grant of supervised release. In *United States v. Grant,* 816 F.2d 440 (9th Cir.1987), we explained the analysis in the context of probation revocation proceedings:

The first step in a revocation decision ... involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation?

*Id.* at 441 (quoting *Gagnon v. Scarpelli,* 411 U.S. 778, 784, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)). The power of volition of a defendant to comply with the conditions of supervised release, of course, is one factor that a district court may consider in the second phase of this analysis. *See Brown,* 899 F.2d at 194; *United States v. Warner,* 830 F.2d 651, 657 (7th Cir. 1987).

■ During the revocation proceedings, Pinjuv admitted that she violated the conditions of her supervision by failing to participate successfully in a mental health treatment program. She argued only that her failure to comply with the condition should be excused on the basis that it was due to an involuntary mental disorder. In response to that assertion, the Government presented evidence that Pinjuv had declined to take her medication as scheduled, that she had refused to eat, that she had contacted 911 repeatedly, that she had refused to comply with program rules, that she had disrupted others, and that she had threatened to hurt herself.[1] At the district court's invitation, Pinjuv's mother made the following statement during the revocation proceedings:

I agree with Your Honor that she should be committed to a mental facility, and

---

1. The presentence investigation report reflects that the Pinjuv had threatened suicide on several prior occasions, and that she had

threatened her family with violence in the past.

perhaps this time they can come up with a solution. This is an ongoing problem. Even before she committed the felonies, she was in and out of jail a number of times. My family feels she's a threat to them, and if you throw her back on the streets you're only gonna have her in some court very shortly for some other reason. There is no program, no place for her to go. And she is not the type that will stay on the streets, she will do something to get back under the prison or jail facilities.

No evidence was submitted in this matter by Pinjuv that her disruptive conduct was involuntary. Before this court, Pinjuv argues that her power of volition concerning her conduct was destroyed by her mental condition. The record shows, however, that her behavior in the group homes was intentional. For example, Pinjuv informed the court during the revocation proceedings that she stopped taking her medicine because she was very angry that she was told to follow the rules of her first group home while other residents violated more serious rules, "like coming in drunk." Based upon the evidence presented during the revocation proceedings, a rational judge could properly infer that her disruptive behavior, and her refusal to take her medication, were voluntary acts.

The district court commented that it did not have "any real option," but to revoke Pinjuv's supervised release.[2] In its order revoking probation and sentencing Pinjuv to a term of imprisonment, the district court made "a very strong recommendation" that she be placed in a prison institution with a mental health facility. The district court also invited Pinjuv "to file within a week anything that you choose to file," or alternatively, to file a notice of an appeal. Pinjuv's counsel chose the latter option and, instead of filing a motion for reconsideration, filed a timely notice of appeal. Given the evidence in the record that imprisonment was necessary to treat Pinjuv's mental illness, to facilitate her rehabilitation, and to assure the public's safety, we hold that the district court did not abuse its discretion in revoking the supervised release order. Unfortunately, the potential consequences of releasing her "to go on the streets" as a homeless person, as recommended by her attorney, were simply too grave to make that option a valid alternative to imprisonment.

AFFIRMED.

---

2. The district court explained its decision to Pinjuv in the following manner:

> Every one of us has circumstances that we have to adjust to. Frankly, you sound lucid today, and I have the feeling that one of the lessons that needs to be learned is that you have to adapt yourself to live in society. Not all people have these kinds of problems. You're very articulate and you address these matters well, but then you engage in conduct that brings you back here, your mother says she doesn't know why.

> Your attorney, I'm sure he doesn't know why either. But I'm not going to put you back on the streets; that causes me great concern. And as far as I can tell that's really the only option that he's suggesting to me at this point, and he's telling me that he has no obligation to put forth any evidence to sustain his position that he's suggesting. And I think I've handled both of these matters. And in looking at all of the unhappy options, I'm convinced that you need some direction and counseling.